**United States District Court**
*District of New Jersey*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | |
| SIXING LIU, <br> a/k/a "Steve Liu" | : <br> : | Magistrate No. 11-8022 (MCA) |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

Lisa Lenches-Marrero
Special Agent, FBI

Sworn to and subscribed
in my presence

March 4, 2011
Date

Newark, New Jersey
City and State

Hon. Madeline Cox Arleo, U.S.M.J.
Name/Title of Judicial Officer

Signature of Judicial Officer

## ATTACHMENT A

On or about November 12, 2010, at Newark Liberty International Airport, in the District of New Jersey, and elsewhere, defendant

SIXING LIU,
a/k/a "Steve Liu"

did knowingly and willfully export and attempt to export to the People's Republic of China defense articles, designated as "Fire Control, Range Finder, Optical and Guidance and Control Equipment" on the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1, Category XII, namely, technical data contained in the document titled "Summary of Simulation Analysis for [Technology Program No. 1]", without having first obtained from the United States Department of State, Directorate of Defense Trade Controls, a license for such export.

In violation of Title 22, United States Code, Section 2778(b)(2) & 2778(c), Title 22, Code of Federal Regulations, Section 120, et seq., and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Lisa Lenches-Marrero, am a Special Agent of the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein based on my own investigation, as well as information provided to me by other law enforcement officers and my review of documents and records. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not necessarily included each and every fact known by the government concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Where statements of others are related herein, they are related in substance and part.

### I. LEGAL BACKGROUND: THE ARMS EXPORT CONTROL ACT/ INTERNATIONAL TRAFFIC IN ARMS REGULATIONS ("ITAR")

1.   The Arms Export Control Act, 22 U.S.C. § 2778 ("AECA"), authorizes the President to control the export of defense articles and services from the United States. The Act requires every person engaged in the business of exporting defense articles from the United States to obtain a license or other approval from the United States Department of State ("State Department"). 22 U.S.C. § 2778(b)(1)(A)(I). The regulations promulgated pursuant to the Act, known as the International Traffic in Arms Regulations (hereinafter, "ITAR") define exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner . . . by a person whose personal knowledge includes technical data." 22 C.F.R. § 120.17.

2.   The ITAR defines a defense article and service to be any item on the United States Munitions List ("USML") contained in the regulations. The Munitions List sets forth twenty-one categories of defense articles that are subject to export licensing controls by the State Department's Directorate of Defense Trade Controls ("DDTC"). 22 C.F.R. § 121.1.

3.   Also covered under the USML is "technical data" relating to the listed defense articles, which includes information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10.

4.   Category XII on the Munitions List includes "Fire Control, Range Finder, Optical and Guidance and Control Equipment," including technical data included in the document titled "Summary of Simulation Analysis for [Technology Program No. 1]" discussed herein.

5.   Unless specifically exempted, persons engaged in the export of defense articles covered by the USML must be registered with the DDTC, and must apply for and receive a valid license or other approval to export the defense article from the United States. 22 C.F.R. § 123.1(a).

1

      6.    With regard to countries against which the United States has an arms embargo, and which are listed in 22 C.F.R. Section 126.1, the ITAR provides that:

> It is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries . . . . This policy . . . applies to countries with respect to which the United States maintains an arms embargo (*e.g.*, . . . [People's Republic of] China. . .) . . . .

22 C.F.R. § 126.1(a).

## II. DEFENDANT'S EXPORT OF USML TECHNICAL DATA TO THE PRC

      7.    Defendant SIXING LIU, a/k/a "Steve Liu," (hereinafter "LIU") is a 47- year-old-Chinese national with lawful permanent resident status in the United States. Defendant LIU was born and educated in the People's Republic of China ("PRC"), where he received his bachelors and masters degrees in mechanical and electrical engineering, and doctoral degree in electrical engineering. In or about 1993, defendant LIU entered the United States. After working as a researcher at a university in the United States, defendant LIU went on to work for several United States technology companies as an engineer. Defendant LIU possesses a PRC passport (issued June 15, 2009; expiring June 14, 2019), which he has used to travel between the United States and the PRC, as further described below.

      8.    From March 30, 2009 until November 30, 2010, defendant LIU worked as a senior staff engineer for a New Jersey-based division of a technology company (the "Company") that develops precision navigation devices and other innovative components for the United States Department of Defense ("DoD"). During his employment with the Company, defendant LIU was part of a research and development team that worked on precision navigation systems for military use, including a program hereinafter referred to as "Technology Program No. 1."

      9.    As part of his training at the Company, defendant LIU received training concerning the safeguarding of sensitive proprietary and export-controlled information. In particular, on April 20, 2009, defendant LIU attended a training program at the Company concerning provisions of the ITAR that prohibit the unlicensed export of items contained on the United States Munitions List and technical data relating to such items. Moreover, the Company regularly included prominent advisories on the pages of its work product warning that the contents may include technical data within the scope of ITAR.

      10.    Due to the highly sensitive nature of the technology projects being developed where defendant LIU worked, employees were forbidden from removing work product from the Company's corporate facility. Company-issued secure laptop computers were made available to certain employees on occasion. However, defendant LIU was never issued a Company laptop and he was not approved to access or possess the Company's work product outside of the Company's facility in New Jersey.

11. Travel records maintained by CBP reveal that on November 12, 2010, defendant LIU boarded a commercial airline flight at Newark Liberty International Airport and flew to Shanghai, the PRC. Prior to the trip, defendant LIU did not disclose to his immediate supervisor, or to any Company employee revealed in the investigation to date, that he (defendant LIU) was traveling to the PRC or the purpose of his trip. Moreover, the investigation has revealed that, in the days leading up to his departure for the PRC in November 2010, defendant LIU told another employee of the Company that he (defendant LIU) was going on vacation not to China, but to Chicago.

12. On November 29, 2010, defendant LIU arrived at Newark Liberty International Airport on a commercial airline flight from Shanghai, the PRC. After retrieving his checked luggage, defendant LIU proceeded to a CBP inspection point in the airport terminal at which point he was selected for secondary inspection by Customs officers. Officers escorted defendant LIU and his baggage to a nearby room.

13. When asked the purpose of his travel, defendant LIU stated that he traveled to the PRC to visit family. When asked if there was any other purpose for his travel, defendant LIU responded that he traveled only to visit his family. An inspection of defendant LIU's baggage revealed an access card with an attached lanyard. On the face of the card, in large letters, the text "V I P" appears, and above that, in smaller letters, the following appears:

> ICMAN 2010, The 4th Annual International Workshop on
> Innovative and Commercialization of Micro & Nano Technologies
> (ICMAN2010), Cum: Forum of IOT & MEMS Applications,
> November 22-24, 2010

14. When asked about the ICMAN conference, defendant LIU stated that it was a small conference that was not formal. Defendant LIU further stated that if it were formal event then his name would be on the card. When asked what the letters "V I P" printed on the card meant, defendant LIU responded that it meant nothing and was not special.

15. As part of this investigation, I retrieved web pages retrieved on various dates from URL address "http://www.icmans.com" concerning a technology conference entitled "The International Workshop on Innovation and Commercialization of Micro and Nanotechnology (ICMAN)" (hereinafter "ICMAN"). The annual conference is organized and sponsored by various entities of the government of the People's Republic of China (hereinafter the "PRC Government"), according to those web pages. Its stated goal is to "gather people related with micro and nanotechnologies from all over the world, including the renowned researchers in the field, chief administrators and senior engineers from industries, research agencies and inventors, as well as venture capital and *government representatives*." (Emphasis added).

16. Moreover, retrieved web pages for ICMAN 2010 set forth a schedule of events, which includes numerous presentations and speeches concerning innovative technologies, as well as remarks to be given by officials of PRC government entities. Listed among the presentations scheduled for November 24 is: "MEMS for Aeronautics and Space, Dr. Sixing Liu, [the Company], USA". Furthermore, the web pages reveal the names of International

3

Committee members for the ICMAN 2010 conference, which include: "Co-Chairs: ... Dr. Sixing Liu, [the Company], USA."

17. Upon further inspection of defendant LIU's belongings on November 29, 2010, Customs officers found a folder containing multiple pages of technical language, pictures of military weapons systems, and documents written in Chinese. Also among defendant LIU's belongings was a non-Company issued laptop computer (hereinafter "Liu's Personal Computer") and other electronic storage devices and media.

18. A court-authorized search of Liu's Personal Computer later revealed:

- Hundreds of documents of the Company, containing internal communications, analyses, data, test results, schematics, images, and security protocols.

- Several iterations of a 14-page Chinese language resume pertaining to defendant LIU that describe his work for the Company on projects for the United States military, the most recent of which was modified on November 16, 2010.

- Digital images, dated November 24, 2010, of LIU delivering remarks to an audience at the 2010 ICMAN technology conference in Shanghai, the PRC.

- Numerous documents relating to defendant LIU spanning a period of years, which collectively indicate that defendant LIU possessed the Liu Personal Computer over an extended period of time prior to his November 2010 trip to the PRC.

19. Numerous documents on the Liu Personal Computer include prominent markings indicating that the contents contain export-controlled technical data under the AECA and ITAR. One such document is titled "Summary of Simulation Analysis for [Technology Program No. 1]" and pertains to a precision navigation/positioning system the Company developed for the U.S. Department of Defense. In addition, each page of the document is prominently marked "ITAR Controlled".

20. On February 10, 2011, the DDTC certified that the document contains technical data that is covered by USML Category XII ("Fire Control, Range Finder, Optical and Guidance and Control Equipment"). Accordingly, the ITAR prohibits the export of that document from the United States to the PRC by any person who is unlicensed to do so.

21. Official database inquiries reveal that defendant LIU has not sought or been issued a license to export articles or technical data covered in the USML.